EVELYN A. HORR

*vs.*

LEE H. JONES AND WINNIFRED L. JONES

JOSEPH A. HORR

*vs.*

LEE H. JONES AND WINNIFRED L. JONES

Cumberland.   Opinion, January 12, 1961.

*Francis Rocheleau,* for plaintiffs.

*Robinson, Richardson & Leddy,* for defendants.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

RESCRIPT.

SULLIVAN, J.  In October, 1959 there were verdicts for the plaintiffs in these actions and the defendants prosecute here their responsive motions for new trials.  The defendants were the landlords of the plaintiffs who are husband and wife and who occupied a tenement in a three family dwelling with a common rear entrance in the normal use of which the plaintiff wife sustained injuries.  Mrs. Horr was awarded a verdict for her personal damages and her husband a recovery of his derivative losses.

Adjoined to the outside of the tenement house and serving its back door and common inside passageways was an uncovered landing with 3 steps descending therefrom to the ground level.  The structure was of wood, 32 inches high, 60 inches long where parallel to the building's side and 45 inches wide.  It was decked on top with planks.  Its sides were boarded and in one was a hinged door, 25 inches high and 17 inches wide, which swung out to permit abbreviated

access to and a view of the under side of the deck above. The planks of the upper platform were laid vertically to the main building. At their terminals next to the building the planks were nailed to a 2 x 4 strip of wood which in turn had been affixed to the building underneath its back door threshold. At their other extremities the planks were affixed by nails to the top edge of the opposite side of the porch, 45 inches from the house siding. On their undersides the top planks were also medially supported at right angles by 2 separated and parallel timbers, 2 x 4, 60 inches long and each attached at its ends by nails to opposite sides of the porch. The planks were each nailed at 4 intervals — at both extremities and to each supporting timber. There were some 8 planks, painted on top only. They were not tongued or grooved but were laid $\frac{1}{8}$ to $\frac{1}{4}$ of an inch apart, with more or less dirt tracked into the interstices.

The back porch was under the control of the defendants and constituted an appurtenance to the tenements of the tenants in the dwelling.

On the day of the accident the plaintiff wife purposed to do some shopping. She descended the common back stairs of the house, stepped out of the rear door and onto the porch deck. Some planks immediately gave way beneath her feet and she crashed below the platform amongst the collapsed boards. She suffered a serious fracture of her right humerus and a scraped leg. She became fast imprisoned in an upright position until extricated by some men who observed her plight. There had been no visible warning of the treacherous condition before the unfortunate event.

Before arguments parties plaintiff and defendant unified the controversy in the cases at bar to that of negligence on the part of the defendants and specifically to the issue whether the landlords prior to the accident had been afforded constructive notice that the porch deck was not in safe repair.

4

The motions for new trials assert that the plaintiff verdicts are against law, evidence and weight of evidence.

As for law the legal duty of landlords applicable in the cases at bar has been authoritatively announced by this court.

> " - - - he has a further duty in respect to halls, stairways and approaches which remain in his control subject to use by the tenant or ordinarily by several tenants.
>
> "He must exercise reasonable care to keep these in safe repair.
>
> " - - - - We conceive the true rule to be that the owner must exercise due care to keep in reasonably safe repair, stairways and passage ways which remain under his own control.
>
> *Miller* v. *Hooper*, 119 Me. 527, 528, 529.
>
> "It is almost universally held that a landlord who has retained control of common stairways owes to his tenants and their invitees the duty of exercising ordinary care to keep such stairways reasonably safe for their intended use. - - - -"
>
> *Thompson* v. *Frankus*, 151 Me. 54, 55.

As to the evidence and its weight in these cases our decisions are clear and uniform.

> "Under the familiar rule we take the evidence with all proper inferences drawn therefrom in the light most favorable to the jury's findings and the verdict stands unless manifestly wrong. - -"
>
> *Britton* v. *Dube*, 154 Me. 319, 320.
>
> "The burden of proving a verdict is manifestly wrong is on the party seeking to set such verdict aside. A verdict will not be set aside unless so manifestly erroneous as to make it appear it was produced by prejudice, bias or mistake of law or fact. The credibility of witnesses and the weight of

their testimony is (are) for the jury. Where evidence presented leaves only a question of fact, about which intelligent and conscientious men might differ, the Law Court will not substitute its judgment for that of the jury. The evidence in a case must be viewed in the light most favorable to the successful party."

*Neal* v. *Linnell,* 156 Me. 1, 4.

The record contains the evidence submitted for jury consideration which we must examine appreciably with the decisions quoted, *supra.*

Several men including the plaintiff husband assisted Mrs. Horr in her plight. Planks were torn away and she was extricated. No planks had been broken by the accident and all of them appeared to be sound. Where the planks had been removed the husband saw a piece of 2 x 4 slanting down from the westerly side of the porch which seemingly would be that side to the right of one leaving the rear door of the tenement house. The husband wrenched the piece of wood and his hands thereupon became wet and soggy. Rotten and decayed timbers — two or three at least — were observed by a witness. After the woman was rescued a witness took 4 pieces of 2 x 4, wet, soggy, crumbly and in varying states of deterioration. They had been attached to the planks inside the hole caused by the mishap and were tipped downward. They were disengaged by the witness who stated the opinion that some portion of them at least was the center support of the planks. The 4 pieces of wood were admitted as exhibits at the trial.

A former carpenter now chief executive of a home construction firm was of the opinion that the 2 x 4's were hemlock or spruce, probably hemlock. He was permitted to testify as follows:

"In porches that are not roofed over, if they are well ventilated underneath, it is reasonable to expect you could get — same   as ordinary entrance

steps to a house, made out of wood — probably 5 to 10 years. If not well ventilated underneath, you can't expect that wood to be alive that length of time. What happens, where there is a great deal of dampness and no change of air, the wood, in our terminology, dozes and the life goes out of it and eventually has a tendency to deteriorate, fall apart, the strength is gone.

"Q. What would be the life expectancy of the same piece of wood in a damp area?

"A. I have seen a number of times wood, where there wasn't air, where it didn't get fresh air, where it was damp, and no change of air, I have seen new hemlock and spruce, both, deteriorate in 2 to 3 years.

"Q. What would be the average period for spruce or hemlock in a damp area?

"A. I should — if I had to give a guarantee, I would say most of them would deteriorate in 3 to 5 years, from 2 to 5 years.

"Q. Is there a standard amongst the carpenters for testing exposed porches in this area?

"A. Not that, there is no set rule that I know of. We have a usual practice, a number of things we do when we go to inspect anything like this.

- - - - - - - - - - -

"A. We would go there, probably walk on the porch. If we knew it was in bad shape we would be careful about jumping on it, but if there was any question, we would jump on it, see if it would hold anyone's weight with pressure. We would also, if the boards were open enough, put a knife blade into the timbers, or drive nails into them. Sometimes we might take up one or two boards to see what we could see, and possibly, if we could get underneath, go underneath them to see what the condition of the timbers is.

"Q. What would you do if you could get underneath?

"A. Test them, there again, with a knife blade or sharp instrument. Sound them out with a hammer."

The plaintiffs had been tenants of the defendants upon the second story of the house continuously from March 1955 until April 30, 1958, the day of the accident. The defendants had owned the property from a time prior to plaintiff's tenancy. The defendant husband had visited the premises upon an average of thrice monthly to collect the rents. He had habitually noticed the railing and floor of the back porch but not the understructure. He had deemed that there was no occasion to inspect the underside through a span of some four years. The rear porch had been in constant use by all the tenants both as an entrance and exit while the front entrance to the building had been seldom employed. The defendants' carpenter had never been instructed to inspect the back porch and had not.

After the accident and the freeing of Mrs. Horr defendant's carpenter was sent to the porch. He found one timber or stringer missing. Of the two supporting timbers beneath the platform it was that which had been placed nearer the main building. The 2 x 4 affixed to the house beneath the porch and the threshold of the back door was still in position but was a "little punky," "just like the others that were there."

"When I say a little punky, I don't mean you could take hold of it in your hand and break it. I mean some dampness. I mean it had started to go."

The carpenter removed the 2 x 4 nailed to the house and substituted another in making the repairs.

Photographs were admitted in evidence. Two had been taken just after Mrs. Horr had been taken to the hospital. One had been taken from the ground level, showing the front, the south side and the top of the porch with its torn

up boards. The other had been taken from above the porch top and afforded a view into the gaping opening occasioned by the accident. Two more photographs taken after the repair of the porch pictured respectively the door in closed position in the westerly side of the porch and the door opened with some view of the area under the porch.

The jury upon the evidence submitted to it appears amply fortified in having concluded that the porch platform partially collapsed and thereby caused bodily injury to a tenant who was rightfully availing herself of it in a conventional way. The jurors had evidential warrant in deducing that the casualty was a result of decadent matter in the substructure of the porch. They were within permissive bounds in deciding that in the exercise of reasonable care the defendants could have and should have discovered by simple and plain inspection the condition and risk involved and made the condition safe.

*Motion denied.*

WEBBER, J. (CONCURRING)

In concurring in this opinion it is my understanding that there is intended no enlargement of the duty heretofore imposed upon landlords. It has been judicially recognized that one must reasonably anticipate that unprotected wood exposed to the weather may deteriorate. Under such circumstances the duty to inspect for evidence of such deterioration will arise. *Barre* v. *Epstein,* 299 Mass. 577, 13, N. E. (2nd) 422. On the peculiar facts of the instant case, even though the uncovered platform was outwardly sound and its floor boards strong, the jury was justified in requiring that the defendant in the exercise of ordinary care make some investigation for signs of such deterioration underneath the platform. It is apparent that the supporting stringer which was completely rotten had been defective for some time, long enough at least to charge the defendant with constructive knowledge of its condition. The loss of this support

would have been apparent, as the opinion of the court points out, upon ordinary inspection beneath the platform. I do not understand that we intimate or suggest what our opinion would be if a concealed defect would be disclosed only by an investigation necessitating the removal of walls or boards. Since none of the floor boards broke, it is apparent that the loss of the rotten stringer did not trigger this accident. Some other circumstance producing the separation of the floor boards from the stringer attached to the house was obviously the immediate producing cause of the caving in of the floor. The exact reason for this occurrence is not disclosed by the evidence. Yet the jury could properly infer from the nature of the supporting structure that if the rotten stringer had been sound and in place, the floor would have been adequately supported and the accident would not have occurred. It is not necessary that the defendant should have anticipated the precise manner in which the defective condition would produce injury if in fact it should have been apparent to him that injury was likely to ensue. In short, the defect which would have been disclosed upon inspection, although clearly not the sole or even the immediate cause of the accident, was properly considered by the jury to be one effective proximate cause of the accident without which it would not have occurred and for which the defendant could be held responsible. Thus limited, the opinion does not in my view make the landlord an insurer of the safety of his tenants, nor does it enlarge his duty to exercise ordinary care (and no more) to keep a common platform or stairway in reasonably safe repair.